CHARLOTTE A. ALLEN,

*vs.*

FRANK B. ADAMS.

*Sussex, Feb.* 18, 1928.

*Frank M. Jones* and *Daniel J. Layton*, for complainant.

*James M. Tunnell*, for defendant.

THE CHANCELLOR. The question presented by this case is— Can the defendant, under an agent's duty to secure for the complainant the recordation of a mortgage lien, refuse to perform that duty for fourteen days, at the end of that time obtain a judgment note in his own favor, and then, holding the complainant's mortgage and his own note off the record for over six years, surrender possession to his principal of the mortgage, within five days thereafter enter judgment on his own note ahead of the mortgage later entered, and retain the advantage thus gained?

The answer to this question may be one way or the other according as the defendant's conduct squares itself or not with the principle of loyalty to his principal and faithfulness to the trust which the relation assumed by him imposes. The defendant in this case was unfaithful in several particulars.

In the first place he should have caused the complainant's mortgage to be recorded very early in the fourteen day period. Had he done his duty in this regard, the conflict in his breast between duty to his principal and his own self interest which his subsequently obtained judgment note gave birth to, never would have arisen. The duty to record the mortgage promptly was so plain, that failure to perform it suspiciously· indicates that the omission was designed to await the securing by the defendant of the promised judgment note.

In the second place, the defendant after obtaining the judgment note was faithless to the duty he owed to his principal in that he allowed over six years to go by, during which time he held the complainant's mortgage off the record. The fact that during that time he also held back his own judgment note does not in anywise minimize the degree of the wrong done to the complainant. In that·period, he knew he could not enter his own note ahead of the

mortage and hope to retain the advantage of priority. He accordingly did nothing, except this, to consult a lawyer (not his present solicitor) at the end of the period to find out how he might possibly slip his own lien ahead of his principal's, a possibility which his own protracted default had created.

Thus far, notwithstanding the defendant's failure to obey his duty, he might still have set himself free to act in conflict with his principal's interests, by surrendering possession of the mortgage to his principal and frankly informing her that he had not recorded it, that there was a judgment note in his own favor which he purposed to record and that she, if she desired priority, should promptly cause her mortgage to be recorded. The contest being solely between the complainant as principal and the defendant as agent, the serving of his own interests by the defendant after such an explicit repudiation of his agency and such a full disclosure of the facts, would not have constituted a breach of the obligation of loyalty which the theretofore existing relationship had imposed. The defendant contends that he did do these very things. Did he? That he surrendered the mortgage is admitted. Whether he told the complainant that the mortgage had not been recorded is a subject of conflict in the testimony. On this conflict, I find as a fact that all the defendant said to his sister, the complainant (who was sick in bed at the time) was this—"Here is your mortgage; there is nothing ahead of it." The defendant's long continued omission to record the mortgage, his refusal to do so on the very day he journeyed from Seaford to Rehoboth to surrender it notwithstanding he passed by the door of the court house where the recorder's office was located, his obtaining of legal advice upon how to place himself in position to get ahead of his principal, his gathering up of witnesses to watch him turn the mortgage over, his insistence upon the witness stand that he was justified in securing a lien superior to the mortgage, are enough to convince the mind that the defendant entertained the well formed design to circumvent his sister, whose trusted agent he had engaged to be, and to take advantage of a situation which his own unfaithfulness to a trust had created. I accordingly accept that account of the Rehoboth visit and what was said on that occasion as detailed by the complainant rather than that which is detailed by the de-

fendant, because to accept the latter would be more in harmony with the successful consummation of what appears to be the defendant's well laid plans.

But even accepting the defendant's own account of the matter, it is to be noted that though he claims to have told his sister that her mortgage had not been recorded, yet at no time does he claim to have also informed her of the fact that he had in his possession an unentered judgment note. Having said to her, as he admits—"there is nothing ahead of it" (meaning the mortgage)—in all fairness to her whose agency he claims he was then terminating and expressly repudiating, he was under duty to inform her of the fact that though nothing was yet entered ahead of her mortgage, yet he was in a position to get a lien for himself superior to her own unless she acted promptly. Failure to do this is thoroughly inconsistent with the spirit of frankness and openness which loyalty to his principal demanded. What he says he did say was calculated to lull her into a sense of security against other liens. Having dropped a remark calculated to have that effect, he ought not to have withheld from her the fact that such security was not only in danger of being destroyed, but would in fact be destroyed by himself.

The first duty an agent owes to his principal is that of loyalty to the trust he has assumed. Of course an agent can repudiate his agency and thereby relieve himself of its obligations. But after the agency is terminated, the agent will nevertheless under certain circumstances still be held accountable to his erstwhile principal for advantages gained by reason of a violation of the duties imposed by his former trust.

The general principle prevails everywhere that an agent "will not be permitted to build up in himself rights and interests against his principal based upon his own neglect or default in the performance of his duty." 1 *Mechem on Agency*, (2d Ed.) § 1216. While of course an agent may in good faith sever his relation as such and be thereafter free to act in his own interest adversely to his principal, "because of the previous trust relations, however, equity will subject such transactions to a rigorous examination to see that the former agent did not abuse his position of trust and influence, or in any way fail in his attitude as agent during the agency; and

an agent cannot terminate the agency in order to take advantage of his principal's condition or of information resulting from his agency." 31 *Cyc.* 1449; *Fountain Coal Co. v. Phelps, et al.,* 95 *Ind.* 271; *Dennison v. Aldrich,* 114 *Mo. App.* 700, 91 *S. W.* 1024.

Even assuming, therefore, that the defendant did, as he claims, terminate his agency in the complainant's sick room at Rehoboth with the plain statement that her mortgage had not been left by him to be recorded, yet having failed to advise her of the advantage which his default had given him over her, he ought not to be permitted in equity to retain or use the advantage so obtained to her injury.

But it is not necessary to rest this case on the proposition just stated, for the weight of the evidence is to the effect that the defendant did not make plain to his sister that he was terminating an unperformed agency. She believed and had a right to believe that her mortgage had been recorded. If it be said that she should have examined the mortgage to see if the recorder had noted thereon the fact of its recordation and her failure to do so constitutes such negligence as would bar her right to relief, it is sufficient to reply, that the defendant is hardly in position to complain that the complainant failed to doubt his loyalty, that the complainant was sick at the time, that she was a woman who is not versed in such matters, and finally that such examination would never of course have disclosed to her that the defendant was himself the holder of a potentially competing lien.

The defendant undertakes to show that on two occasions the complainant was informed by the defendant's son that the mortgage was not recorded. These occasions were well prior to the Rehoboth meeting. The complainant denies being so informed. The point of fact does not seem to me to be important, because if the complainant knew on those occasions that the mortgage had not been thus recorded, she was entitled to think that the defendant would nevertheless go ahead at a later time and perform his duty.

The agent in this case was a gratuitous one. That circumstance, however, does not relieve him of the obligation of loyalty and fidelity which the relation imposes. *Ripka, et al., v. Gwinn, et al.,* 14 *Del. Ch.* 101, 122 *A.* 137. It is argued that a gratuitous agent is not bound by the same strict rules to which one is held who

occupies the position of a paid agent. How this argument is of any pertinency here it is difficult to see, for the question here is not one of negligence in the manner of performing a duty; it is a question of willful disregard of duty by an agent and his personal advantage gained thereby. Even if it were a question of degree of negligence, which it is not, the defendant, by failing to do the very thing his agency required, would according to the authority of *Crawford v. Louisiana State Bank*, 1 *Mart.* (*N. S.*) 706, be guilty of gross negligence, a degree of negligence for which a mere volunteer is unquestionably responsible.

The defendant sets up an equitable right to retain the position of a prior lienor on the ground that it was his money (loaned to the son) which went to pay off existing liens on the farm, liens which the complainant was obligated to pay. This is thoroughly specious. It assumes that the fifteen hundred dollars instead of being paid as a part of the purchase price was equitably paid for the purchase by the defendant of existing liens. There is not one word of testimony to support this theory. The agreement of sale which the defendant witnessed negatives it by naming six thousand dollars as the purchase price the complainant was to receive. Furthermore, it was shown that little, if any, of the fifteen hundred dollars loaned by the defendant to the purchaser went to pay off liens. The fact is that the complainant's son paid off from his own funds the principal lien, because the same had been placed there by his mother to raise money for him in his business.

The foregoing views render it unnecessary to enter upon a consideration of the further contention made by the complainant, to the effect that her mortgage was in fact a purchase money mortgage, the defendant knew it and, it being a mortgage to secure a portion of the purchase money, the complainant's equity outranks that of the defendant.

Let a decree be prepared in accordance with the prayers of the bill, with costs on the defendant.